# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

MARK ANTHONY CAPLINGER,     )
                             )
       **Plaintiff,**     )
                             )      **No. 2:14-00020**
**v.**                           )      **Judge Nixon/Brown**
                             )
**CAROLYN W. COLVIN,**     )
**ACTING COMMISSIONER**     )
**OF SOCIAL SECURITY,**     )
                             )
       **Defendant.**     )

**To: The Honorable John T. Nixon, Senior United States District Judge**

## REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration ("the SSA"), through its Commissioner ("the Commissioner"), denying plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 8) be **DENIED** and the Commissioner's decision **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for DIB on August 29, 2011 alleging a disability onset date of March 14, 2011. (Doc. 5, pp. 56-58, 125, 153, 208)[1] Plaintiff claimed that he was unable to work because of back problems, leg and knee pain, arthritis, high blood pressure, nerves, and depression. (Doc. 5, p. 62) Plaintiff's claim was denied initially on November 17, 2011 and again upon reconsideration on February 13, 2012. (Doc. 5, pp. 59-62, 66-68)

---

[1] References to page numbers in the Administrative Record (Doc. 5) are to the page numbers that appear in **bold** in the lower right corner of each page.

Plaintiff requested a hearing before an administrative law judge (ALJ) on March 7, 2012. (Doc. 5, pp. 69-70) A hearing was held on September 7, 2012 in Franklin, Tennessee before ALJ J. Dennis Reap. (Doc. 5, pp. 29-55) Vocational expert (VE) Chelsea Brown testified at the hearing. (Doc. 5, pp. 29, 47, 49-51, 105-106)

The ALJ entered an unfavorable decision on October 22, 2012. (Doc. 5, pp. 11-28) Plaintiff filed a request with the Appeals Council on December 13, 2012 to review the ALJ's decision. (Doc. 5, pp. 8-9) The Appeals Council denied plaintiff's request on December 24, 2013 whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 5, pp. 1-5)

Counsel brought this action on plaintiff's behalf on February 2, 2014. (Doc. 1) Plaintiff filed a motion and brief for judgment on the administrative record on May 22, 2014. (Docs. 8-9) The Commissioner responded on June 16, 2014. (Doc. 11) Plaintiff replied on June 30, 2014. (Doc. 12) This matter is now properly before the court.

## II.  REVIEW OF THE RECORD[2]

### A.  Medical Evidence

The record shows that Dr. James Wall, M.D., treated plaintiff at least monthly from January 30, 2009 through December 18, 2012. Although his treatment records are largely indecipherable,[3] Dr. Wall appears to have treated plaintiff for back pain (Doc. 5, pp. 339, 342-45, 347, 349-50, 352, 355, 358-60, 362-63, 368, 370-74, 376, 378-79, 448-52, 469-71, 476-77, 490-492, 494), osteoarthritis pain (Doc. 5, pp. 340, 344-45, 347, 350-51, 353-55, 359, 361-71, 375, 378, 450, 468-69, 490-91, 493), knee pain (Doc. 5, pp. 359, 362-63, 366, 368, 376, 470, 478, 490-91), the gout (Doc. 5, pp. 357, 364-65, 448, 452, 490, 492, 494), leg and foot pain (Doc. 5, pp. 450, 470, 490).

[2] Review of the medical evidence and the transcript of the hearing are tailored to plaintiff's claims of error.

[3] As discussed below at p. 12, counsel supplemented the record post-hearing to provide a transcription of Dr. Wall's clinical notes for the period March 4, 2011 through August 6, 2012. (Doc. 5, pp. 218-23)

To the extent that Dr. Wall's medical records can be deciphered, they are based solely on plaintiff's subjective complaints as are the transcribed records noted above at p. 2 n. 3.

Dr. Wall completed an assessment of plaintiff's ability to do work-related activities on August 31, 2012.  (Doc. 5, pp. 479-82)  In his assessment, Dr. Wall noted that "[s]everal times a day this patient elevates his right leg for knee pain relief and to prevent swelling."  (Doc. 5, p. 482)  Thereafter, Dr. Wall executed an affidavit on January 8, 2013 that was attached to plaintiff's *Memorandum in Support of Request for Review* submitted to the Appeals counsel.  (Doc. 5, pp. 495-87)  Dr. Wall noted the following in his affidavit: 1) "I have reviewed the medical assessment I prepared on August 31, 2012 . . . [and] . . . [t]he limitations described in the assessment existed then and continue to exist . . . ."; 2) plaintiff "is experiencing so much pain from his back that he is seriously considering surgery, if recommended by the neurologist."  (Doc. 5, ¶¶ 4, 6, pp. 495-96)

Dr. Donald Arms, M.D., treated plaintiff more than thirty times during the period July 8, 2011 through February 21, 2012.  Dr. Arms interpreted not less than six x-rays of plaintiff's right knee during the period July 8, 2008 to April 26, 2011.  (Doc. 5, pp. 283, 301, 306, 314, 326, 331)  On July 8, 2008,  he noted that there was "no evidence of acute or recent remote fracture, dislocation, subluxation,[4] lytic[5] or blastic process[6] or bony destructive lesions."  (Doc. 5, p. 283)  He repeated this finding five times over the nearly three years that followed (Doc. 5, pp. 301, 306, 314, 326, 331), adding on March 12, 2009 that there also were "no loose or foreign bodies evident" (Doc. 5, p. 301).

---

[4]  Subluxation – "an incomplete or partial dislocation." *Dorland's Illustrated Medical Dictionary* 1791 (32 ed. 2012).

[5]  Lytic (lysis) – "dissolution or destruction of an organ or structure, such as the destruction of bone . . . ." *Dorland's* at 1089-90.

[6]  Blastic – "pertaining to or characterized by . . . growth . . . [that] . . . takes place by a process of enlargement . . . ." *Dorland's* at 223, 404, 483, 1694.  Process – "a prominence or projection . . . of bone." *Dorland's* at 1517.

On July 8, 2008, Dr. Arms noted that "[m]ild osteoarthritic changes [we]re present with medial[7] joint space narrowing and patellofemoral[8] osteophyte[9] formation." (Doc. 5, p. 283) Thereafter, on March 12, 2009, he noted that plaintiff "ha[d] no progressive loss of joint space"(Doc. 5, p. 301), on October 8, 2009 that plaintiff "continue[d] to have mild joint space narrowing . . . [that] . . . seems to be radiographically nonprogressive in comparison to initial radiographs" (Doc. 5, p. 306), on May 17, 2010 that the "[j]oint space narrowing [wa]s nonprogressive, neither is subchondral sclerosis"[10] (Doc. 5, p. 314), again on January 13, 2011 that "[t]here is no progressive joint space narrowing compared to previous radiographs noted" (Doc. 5, p. 326), and on April 26, 2011 that comparison of the medial joint space narrowing was "slightly greater" in his right knee than his left knee (Doc. 5, p. 331).

Dr. Arms noted on July 8, 2008 that "[t]he patella [wa]s normal in relationship to the joint line." (Doc. 5, p. 283) Dr. Arms repeated this observation on March 12, 2009, May 17, 2010, January 13, 2011, and April 26, 2011 (Doc. 5, pp. 301, 314, 326, 331), adding on March 12th, January 13th and April 26th that there was "mild" patella tilt (Doc. 5, pp. 301, 326, 331), on October 8, 2009 that "patellofemoral arthritic changes [we]re also present, but . . . nonprogressive" (Doc. 306), and on January 13th that "[p]atellofemoral changes remain mild with osteophyte formation" (Doc. 326).

---

[7] Medial – "pertaining to the middle; closer to the . . . midline." *Dorland's* at 1118.

[8] Patellofemoral – "pertaining to the patella [knee cap] and the femur." *Dorland's* at 1395.

[9] Osteophyte – "a bony excrescence [abnormal outgrowth] or osseous [bony] outgrowth." *Dorland's* at 657, 1343, 1348.

[10] Subchondral sclerosis – "subcartilaginous [beneath the cartilage] . . . hardening of a part from inflammation . . . ." *Dorland's* at 1680,1790.

On July 8, 2008, Dr. Arms noted a "suggest[ion] of joint effusion"[11] (Doc. 5, p. 283), and later on April 26, 2011 "mild joint effusion" (Doc. 5, p. 331). Dr. Arms also noted on January 13, 2011 that the knee "[s]oft tissues [we]re benign." (Doc. 5, p. 326)

Dr. Arms also interpreted two MRI's of plaintiff's right knee during this same period, the first on July 29, 2008 and the second on September 2, 2010. (Doc. 5, pp. 285, 323) The July 29th MRI "demonstrate[d] medial meniscal pathology and patellofemoral signal change of the cartilage . . . [with] . . . some signal change of the medial meniscus, but . . . [no] . . . dramatic joint effusion." (Doc. 5, p. 285) The September 2, 2010 MRI "confirm[ed] that there [wa]s still some signal change in the medial meniscus characteristic of probably a tear to the surface . . . a little joint effusion . . . [and] . . . [t]he Patellofemoral cartilage changes [we]re . . . a little bit more progressive . . . ." (Doc. 5, p. 323)

Dr. Arms interpreted two x-rays and a MRI of plaintiff's back during this same period. On July 8, 2008, he wrote: "AP[12] and lateral lumbar spine demonstrates no fracture, dislocation, subluxation, lytic or blastic process or bony destructive lesions. Lordosis[13] is maintained. No major pedicle or posterior element rotation. Pelvis is balanced SI[14] joints are benign." (Doc. 5, p. 283) He added that, "[a]t L2-3 interval he does have some endplate wedging[15] that could be

---

[11]  Effusion – "the escape of fluid into a part or tissue . . . ." *Dorland's* at 595.

[12]  AP – "anteriorposterior," *i.e.*, the abbreviation for front and back. *Dorland's* at 98, 113, 1502, 2109.

[13]  Lordosis – "a concave portion of the vertebral column as seen from the side." *Dorland's* at 1074.

[14]  SI – "the joint of articulation between the sacrum and ilium," *i.e.*, the sacroiliac joint. *Dorland's* at 1662.

[15]  Endplate wedging (Wedge compression fracture) – "compression fracture of only the anterior part of a vertebra, leaving a wedge shaped vertebra." *Dorland's* at 743.

characteristic of a compression deformity but it appears to be more chronic than subacute [16]." (Doc. 5, p. 283)  On  March 12, 2009 he wrote: "[s]tanding AP and lateral lumbar spine demonstrates no changes from previous radiographs. There is no new pedicle or posterior element rotation. There is no new anterior depression deformity. There is no loss of lordosis. There is no listhesis[17]. There is no evidence of acute bony injury to the spine."  (Doc. 5, p. 301)  The MRI "reveal[ed]  multiple levels of degenerative change and facet[18] arthropathy.[19]  There may be some signal in the annular ligament[20] at multiple levels, but no large disc herniations and I do not appreciate any signal level of focal neural impingements."  (Doc. 5, p. 285)

Dr.  Arms'  treatment  records  also  show  that  plaintiff  consistently  declined recommendations/suggestions that he consider diagnostic/therapeutic knee arthroscopy (Doc. 5, pp. 291, 299, 302, 304, 306, 308, 313-14, 316, 320, 323, 326, 329, 332, 335, 385, 466), or surgical intervention for his back pain (Doc. 5, pp.  295, 301).[21]  The treatment records also show that

---

[16]  Subacute – "somewhat acute [having a short and relatively severe course]; between acute and chronic [persisting over a long period of time]."  *Dorland's* at 24, 359, 189,

[17]  Listhesis – related to the "forward displacement . . . of one vertebra over another . . . ."  *Dorland's* at 1754.

[18]  Facet – "a small plane surface on a hard body, as on a bone."  *Dorland's* at 668.

[19]  Arthropathy – "any joint disease."  *Dorland's* at 158.

[20]  Annular ligament – the external ligament surrounding the disc.  *Dorland's* at pp. 94, 1037.

[21]  Notwithstanding his repeated refusal to seek surgical intervention to relieve his pain, plaintiff did tell Dr. Arms on March 29, 2011 that he was "ready to consider back surgery if it would relieve his symptoms." (Doc. 5, p. 330) Thereafter, on July 8, 2011, Dr. Arms provided plaintiff with the name of Dr. Michael Schlosser, M.D., a neurosurgeon, for an assessment of his back.  (Doc. 5, p. 337)
    The record supports the conclusion that plaintiff expressed willingness to consider back surgery on March 29, 2011, but only after his Worker's Comp case worker advised Dr. Arms that he could no longer provide plaintiff with orthopedic care under Worker's Comp.  Specifically, the record shows that, on March 10, 2011, Dr. Arms noted that he had been contacted by plaintiff's Worker's Comp case manager who advised Dr. Arms that he "could no longer provide [plaintiff] with any orthopedic care" and that, if the plaintiff contacted the office to "have him contact his case manager to setup [*sic*] any further office appointments . . . ."  (Doc. 5, p. 328)  Dr. Arms noted, "I . . . do not know the details of why we are not allowed to see him anymore."  (Doc. 5, p. 328)  Plaintiff visited Dr. Arms' office March 29, 2011 at which time Dr. Arms advised him that Worker's Comp "[w]as not allowing [him] to provide treatment recommendations

plaintiff consistently declined to schedule a Worker's Comp impairment assessment during the period Dr. Arms treated him.[22] (Doc. 5, pp. 313, 315-16, 320, 324, 327, 332, 335, 337, 384, 466) The treatment records show further that, on March 29, 2011, Dr. Arms also "recommended" seeing whether plaintiff "would be allowed to have a trial of desk duty with his leg elevated . . . until we can get his pain better managed," noting again nearly a year later on February 21, 2012 that he was "hopeful that desk duties with intermittent extremity elevation and icing to the knee might be an option." (Doc. 5, pp. 330, 467)

Dr. Jeffrey Hazlewood, M.D., P.C., treated plaintiff for back pain from April 21, 2009 through March 28, 2011. Dr. Hazlewood reported during his initial examination of plaintiff that Dr. Arms' July 2008 MRI of the lumbar spine was "basically a normal study with mild degenerative disc changes." (Doc. 5, p. 410) Dr. Hazlewood also reported that a MRI of plaintiff's right knee ordered by Dr. Arms was "basically unremarkable, except for some mild degenerative meniscal changes," and that plaintiff was "not interested" in knee surgery to relieve his pain. (Doc. 5, pp. 410-11) Finally, Dr. Hazlewood reported in his initial examination that plaintiff had "5/5 strength in the bilateral upper and lower extremities" with "[g]ood range of motion throughout all extremities without any joint laxity or tenderness in the extremities themselves . . . ." (Doc. 5, p. 411)

Dr. Hazlewood's records also show the following based on his examinations of plaintiff during the period of treatment: 1) 5-/5 to 5/5 strength in the "bilateral lower extremities without any focal weakness"[23] (Doc. 5, pp. 394-400, 402, 407-08, 411); 2) lumbar spine tender/diffusely

---

for the lumbar spine." (Doc., pp. 329-30) It was on that date that plaintiff told Dr. Arms that he would consider back surgery if it would relieve his symptoms. (Doc. 5, p. 33) As discussed below at p. 9 n. 27, the action taken by Worker's Comp was based on plaintiff's having cancelled a Worker's Comp Functional Capacity Evaluation (FCE).

[22] Plaintiff filed his claim for DIB at the same time he had a Worker's Comp claim pending based on all or some of the same physical limitations alleged in his SSA claim.

[23] Dr. Hazlewood reported "some give away" on March 18, 2010. (Doc. 5, p. 400)

tender/mildly tender upon palpitation (Doc. 5, pp. 394-99, 402, 407-08, 411); 3) flexion and extension of the lumbar spine with pain (Doc. 5, pp. 398-400, 402, 407, 411) but no evidence of radicular symptoms and no radiculopathy on examination (Doc. 5, pp. 397, 402); 4) occasional lower back swelling[24] (Doc. 5, pp. 395-96, 406-08); 5) intermittent back spasm (Doc. 5, pp. 394-95, 398, 400, 402, 407-08, 411); 6) negative straight leg raise (Doc. 5, pp. 394, 398, 400, 402, 408); 7) normal/non-antalgic[25,26] gait (Doc. 5, pp. 394-400, 402, 406-11); 8) "[g]ood range of motion throughout the lower extremities without any joint laxity or tenderness in the extremities themselves" (Doc. 5, pp. 394-400, 402, 406-08, 411); 9) positive for gout of the left foot (Doc. 5, p. 396). The following additional notes appear in Dr. Hazlewood's medical records: 10) Plaintiff returned to work at his regular job prior to October 29, 2009 sometimes with, and sometimes without restrictions (Doc. 5, pp. 394-400, 402, 406-08, 410, 412); 11) a repeat MRI made of plaintiff's back during this period "did not show any significant pathology," any "anatomical changes or any 'new injury' from Dr. Arms' earlier MRI through May 27, 2010, or any "evidence of radiculopathy" (Doc. 5, p. 397); 12) another MRI of plaintiff's right knee ordered by Dr. Arms, reviewed on September 30, 2010, revealed "a torn meniscus" but "not[hing] that need[ed] surgery" (Doc. 5, p. 395); 14) plaintiff was disinclined to have a FCE[27] (Doc. 5, pp. 402, 404); 15) plaintiff's "primary

---

[24] Dr. Hazlewood noted that, as of September 1, 2009, he had "never been able to actually see" the swelling. (Doc. 5, p. 408)

[25] Antalgis – "counteracting or avoiding pain, as a posture or gait assumed so as to lessen pain." *Dorland's* at 97.

[26] Dr. Hazlewood noted once on April 22, 2010 that plaintiff's "[g]ait is antalgic and slow." (Doc. 5, p. 398)

[27] Dr. Hazlewood's office records include the following notes relevant to the referral to Dr. Schlosser: 1) on February 4, 2011 it was reported to Dr. Hazlewood's office that plaintiff cancelled a scheduled Worker's Comp FCE without permission and that he did not intend to complete one (Doc. 5, p. 392); 2) on March 14, 2011, when plaintiff had not rescheduled the FCE, Dr. Hazlewood's office left a message for him that he needed to follow up with Dr. Hazlewood so the FCE could be rescheduled (Doc. 5, p. 392); 3) on March 21, 2011, when plaintiff had not responded, Dr. Hazlewood's office tried again – unsuccessfully – to contact plaintiff at work and at home in an effort to schedule a followup with Dr. Hazlewood so the FCE could be rescheduled (Doc. 5, p. 392); 4) on March 28, when plaintiff still

care physician . . . really ha[d]n't done anything [as of March 18, 2010] . . . no treatment . . . ." (Doc. 5, p. 400).

Dr. Donita Keown, M.D., performed a consultive physical examination of plaintiff on October 21, 2011.  (Doc. 5, pp. 386-88)  Dr. Keowan reported that plaintiff "could be expected to sit 7 or 8 hours in an 8-hour day, walk or stand 6 hours in an 8-hour day, perform lifting of 30 to 35 pounds on an occasional basis, and 15 pounds on a more frequent basis."  (Doc. 5, p. 388)

Dr. Charles Settle, M.D., conducted a physical residual functional capacity (RFC) assessment of plaintiff on November 11, 2011.  (Doc. 5, pp. 423-431)  Dr. Settle determined that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand or walk a total of 6 hours in an 8-hour workday with normal breaks, could sit a total of 6 hours in an 8-hour workday, and that he had no push/pull limitations with either his hands or feet.  (Doc. 5, p. 424)  Dr. Settle determined that plaintiff could occasionally climb ramps/stairs, ladders/ropes/scaffolds, balance, stoop, kneel crouch, and crawl.  (Doc. 5, p. 425)  Dr. Settles further noted that plaintiff's "allegations of pain and limitations [we]re only partially credible . . . [because his] . . . statements regarding function and severity [we]re not fully consistent with the overall evidence in [the] file."  (Doc. 5, p. 430)  Finally, Dr. Settles noted that "[i]maging . . . shows mild deg[enerative] changes in the lumbar spine and r[igh]t knee," "mild limitations in ROM [range of motion] of lumbar spine and hips," "[k]nee ROM . . . mostly normal," "[s]trength and mobility . . . mostly intact," and "[n]o evidence of other significant [joint] arthritis."  (Doc. 5, p. 431)

Dr. Nathaniel Robinson, M.D., completed a physical RFC assessment on February 8, 2012. (Doc. 5, pp. 455-463)  Dr. Robinson determined that plaintiff could lift 20 pounds occasionally, 10 pounds frequently, could stand or walk a total of 6 hours in an 8-hour workday with normal breaks,

---

had not responded, Dr. Hazlewood's office tried again – unsuccessfully – to contact plaintiff at home and work (Doc. 5, p. 392) in an effort to reschedule the FCE.

could sit a total of 6 hours in an 8-hour workday, and that he had no push/pull limitations with either his hands or feet. (Doc. 5, p. 456) Dr. Robinson determined that plaintiff could occasionally climb ramps/stairs, balance, stoop, kneel crouch, and crawl, but never climb ladders/ropes/scaffolds. (Doc 5, p. 457) Dr. Robinson further determined that the "functional restrictions alleged are disproportionate to the clinical findings." (Doc. 5, p. 462)

## B. Transcript of the Hearing

Plaintiff testified upon questioning by counsel that he injured his back and knee in 2008, 2009, and 2010 while working at Walmart. (Doc. 5, p. 33) He testified that Walmart terminated his employment after the third injury because they were unable to accommodate his injury-related restrictions. (Doc. 5, p. 34)

When counsel asked how he spent his day, plaintiff responded that he took a shower, tried to "eat a little," then would have to sit down because his legs and back would start to hurt. (Doc. 5, p. 34) Plaintiff testified he had an arthroscopic procedure on his left knee several years before, but that his left knee had begun to hurt again. (Doc. 5, p. 34) Plaintiff testified further that he took medication, that he had to elevate both of his legs in a recliner to relieve the pain in his knees, that he was unable to stand longer than 20 to 30 minutes at a time, and that he spent his time going "back and forth" between his bed, the couch, and the recliner. (Doc. 5, pp. 34-35) Plaintiff also testified that his back swelled and, when it did, he had back spasms, that the pain would "shoot[]" down his legs, and that he had to change positions constantly to ease the pain. (Doc. 5, p. 35) According to plaintiff, elevating his knees and lying back helped both his knees and his back. (Doc. 5, p. 36)

Plaintiff testified that he had the gout for about ten years, that he suffered from the gout about once a month or every six weeks and that, although the gout usually lasted only a day or two, his most recent bout lasted four weeks. (Doc. 5, p. 36) Plaintiff explained further that he usually

had the gout in his feet but more recently he had begun to have it in his knee, his elbow, and his wrist. (Doc. 5, p. 36) Plaintiff described the gout as causing the joint to "swell and inflame" and, when he had it, he was unable to do anything, and that sometimes it was so sore that he "couldn't let a bed sheet touch it." (Doc. 5, pp. 36-37)

Plaintiff testified that the doctor put him on a 10-pound lifting restriction when he was first injured, and that he tried to avoid lifting as much as he could. (Doc. 5, p. 37) Plaintiff also testified that sitting in one position hurt even when driving, that he had to "squirm . . . constantly" to deal with the discomfort, and that the pain would settle into his hips. (Doc. 5, p. 37) Plaintiff testified further that it was difficult to sleep when his back, legs, and hips hurt. (Doc. 5, p. 37)

As for his medications, plaintiff testified that a "few" made him drowsy and dizzy, the pain medication made him sick to his stomach, but the medication for the gout was "really hard" on his stomach. (Doc. 5, pp. 37-38) Plaintiff noted that his condition was worse when it was rainy and cold. (Doc. 5, p. 38) He also testified "I can't be on my feet no period of time, can't stand up no period of time." (Doc. 5, p. 38) Plaintiff concluded: "I really don't want" back surgery, and "I don't . . . want that knee replacement." (Doc. 5, p. 38)

The ALJ questioned plaintiff following counsel's questioning. The following questions were asked and answered pertaining to plaintiff's Worker's Comp claim:

> Q      Did you settle all your Worker's Compensation?
>
> A      No, no.
>
> Q      What's the status?
>
> A      They're just dragging it out, dragging it out.[28]
>
>                  . . .

---

[28] *See* pp. 6, 9 nn. 21, 27 above.

| Q | Did you go see Dr. Schlosser? |
|---|---|
| A | Dr. Schlosser? |
| Q | Yeah, he said he was a good neurosurgeon. He was sending you to somebody for your back, Dr. Arms. |
| A | No, they never did approve another back doctor. They're trying to get one approved now . . . . |

(Doc. 5, pp. 39-40)

The ALJ and counsel then engaged in a lengthy discussion about Dr. Wall's notes, which the ALJ characterized – charitably – as "extremely difficult to read." (Doc. 5, pp. 41-43) The ALJ provided counsel the opportunity post-hearing to supplement the record to clarify Dr. Wall's notes (Doc. 5, p. 41) which, as noted above at p. 2 n. 3, he did.

Plaintiff then testified that he wore a knee and a back brace, that he had epidurals for his back, and that he had participated in physical therapy. (Doc. 5, pp. 43-44) When asked what part of his body hurt most, *i.e.*, which affected his ability to function most, plaintiff replied that his back hurt worse than his knees. (Doc. 5, p. 44) Plaintiff claimed that his average daily pain level was 7 to 8 on a scale from 0 to 10, where 10 is extreme pain, and that he had experienced this level of pain since he was first injured. (Doc. 5, p. 45) Plaintiff testified again that he could stand 20 to 30 minutes at the most, and that he could not sit for longer than 40 minutes, adding that he could not sit "stationary," and that he had to elevate his legs and move around a lot. (Doc. 5, pp. 45-46)

The ALJ then asked plaintiff if Dr. Arms had recommended a procedure on his knee. (Doc. 5, pp. 47-48) Plaintiff replied that Dr. Arms "left it open . . . for [plaintiff] to decide." (Doc. 5, p. 48) When the ALJ asked when he had last been given a steroid shot, plaintiff replied "a year or over," adding that "[t]hey made you feel like you look[ed] swelled . . . they wasn't helping as much as what the outcome. I just didn't like them." (Doc. 5, p. 48)

The ALJ provided the following hypothetical for the VE to consider after questioning plaintiff:

> [C]onsider an individual with the claimant's age, education and work experience. Further consider a capacity for sedentary work as defined in the regulations. Further consider a need to elevate the leg on a footstool, approximately one foot high. Given that hypothetical, are there jobs available, sedentary jobs?

(Doc 5, p. 49) The VE replied that the hypothetical person could work as a "telephone solicitor," "appointment clerk," and "addresser," all of which were available at the sedentary level, and all of which existed in substantial numbers in both the national and local economy. (Doc. 5, p. 49) The VE added that "a person would [not] be productive if they had to elevate [their foot] any higher" than the "footstool" reference in the hypothetical. (Doc. 5, p. 50)

Counsel then asked the VE to consider his testimony in the context of the medical assessment completed by Dr. Walls, noted above at p. 3. (Doc. 5, p. 50) The VE testified that the hypothetical person would not be able to perform the jobs identified because the work in Dr. Walls' medical assessment was "less than full time work." (Doc. 5, p. 51)

Turning back to plaintiff, the ALJ asked how frequently he experienced the gout. (Doc. 5, p. 51) Plaintiff, replied that he could "have it twice a month sometimes," that "it might last . . . a day or two . . . ," but that he "had it four weeks before." (Doc. 5, p. 51) Plaintiff also testified that, when he had the gout, he had to sit down because he was unable to walk. (Doc. 5, p. 51) Plaintiff testified further that he has medication that he is supposed to take when he feels the symptoms of the gout coming on, and that it helps "sometimes." (Doc. 5, p. 52) Finally, plaintiff testified that he spent his day doing "a little exercise," waking his dog, doing what work he can around the house, watching television, reading his Bible, and playing video games. (Doc. 5, p. 52)

### C. The ALJ's Notice of Decision

13

Under the Act, a claimant is entitled to disability benefits if he can show his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905.  Corresponding regulations outline the five-step sequential process – described below – to determine whether an individual is "disabled" within the meaning of the Act.

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability.
>
> Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment.
>
> Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, then he is deemed disabled.
>
> Fourth, the ALJ determines whether, based on the claimant's RFC, the claimant can perform his past relevant work, in which case the claimant is not disabled.
>
> Fifth, the ALJ determines whether, based on the claimant's RFC, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.

*See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2014).  While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile.  *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011)(internal quotation marks omitted).

The SSA's burden at step five may be met by relying on the medical-vocational guidelines, known in the practice as "the grids," but only if the claimant is not significantly limited by

nonexertional impairment, and then only when "the characteristics of the claimant exactly match the characteristics of one of the rules." *Wright v. Massanari*, 321 F.3d 611, 615-16 (6th Cir. 2003). In cases where the grids do not direct a conclusion as to the claimant's capacity, the SSA must come forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through the testimony of a VE. *See Wright*, 321 F.3d at 616 (citing SSR 83-12, 1983 WL 31253 (SSA)). In determining the claimant's RFC for purpose of the analysis at steps four and five, the SSA is required to consider the combined effect of all the claimant's impairments. 42 U.S.C. §§ 423(d)(2)(B), (5)(B); 20 C.F.R., 404.1523; 404.1545(a)(2); *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 726 (6th Cir. 2014).

## III.  ANALYSIS

### A.  Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374 (internal citations and quotation marks omitted). Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Gentry*, 741 F.3d at 722 (internal citation omitted); *see Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374 (internal citation omitted). In other words, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). On the other hand, an ALJ's failure to follow agency rules and regulations denotes

a lack of substantial evidence, even where the conclusion may be justified based upon the record. *Gentry*, 741 F.3d at 722 (internal citations and quotation marks omitted).

## B. Claims of Error

### 1. Whether the ALJ Erred in Determining That Plaintiff Had the RFC to Perform Sedentary Work with Elevation of the Leg Approximately One Foot High Using a Foot Stool (Doc. 9, pp. 3-4)

Plaintiff argues that "[t]he ALJ committed reversible error in finding that [he] had the residual functional capacity to perform sedentary work as defined in 20 CFR 414.1567(a) except [that] he need[ed] to elevate his leg approximately one foot high using a foot stool." (Doc. 9, p. 3) Plaintiff argues further that "[a] review of the entire record reveals that the plaintiff is not capable of performing the sedentary work, with said restrictions . . . or any work on a sustained basis." (Doc. 9, p. 4) Plaintiff provides no factual allegations, argument, references to the record, or citation to case law to support of his first claim of error within the body of his first claim of error. Rather, he refers the court to his second claim of error, discussed in relevant part at p. 17 below.

Plaintiff's RFC is an assessment of "the most he can do despite his limitations." 20 C.F.R. § 404.1545(a)(1). In making this determination, the ALJ must consider all relevant evidence in the record. 20 C.F.R. § 404.1545(a)(1); SSR 96-8P, 1996 WL 374184 at * 5 (S.S.A.). This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 404.1545(a)(3). However, "the ALJ is not required to simply accept the [opinion] of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, __ Fed.Appx. __, 2014 WL 3882671 at * 8 (6th Cir. 2014)(internal citations omitted).

The Magistrate Judge has examined both the first and second claims of error in considering plaintiff's first claim of error.  Standing alone, plaintiff's first claim of error is conclusory.  The only part of the second claim of error that is applicable is that portion of plaintiff's memorandum quoted below.

> [T]he ALJ found that Mr. Caplinger had the residual functional capacity to perform sedentary work except he needs to elevate his leg approximately one foot high using a foot stool.  However this accommodation will not allow plaintiff to perform sedentary or any work as **he elevates both of his legs more than one foot** the majority of the day in his recliner, which foot rest measures 15" from the floor, and reclines to help alleviate his back, leg and knee pain.  (See plaintiff's affidavit forward to Appeals Counsel as new and material evidence which the ALJ did not have the opportunity to review.)  There was no mention at the hearing of the height that the plaintiff elevates his leg, just that he uses his recliner.  Apparently, the ALJ just arbitrarily used one foot as the height for elevation of the right foot but failed to take into consideration that Mr. Caplinger elevates both legs and reclines to help alleviate both his knee and back pain.  Also, the ALJ failed to mention that Dr. Arms had not only recommended 'desk duties with intermittent extremity elevation' but went on to add 'icing to the knee might be an option.'

(Doc. 9, p. 19)(bold in the original, internal references to the record and footnote omitted)

The paragraph quoted above from plaintiff's second claim of error comprises three apparent arguments: 1) the ALJ erred because the foot rest on plaintiff's recliner measures 15 in. from the floor and, as such, it is 3 in. higher than the "approximately one foot high" footstool that the ALJ posed in the hypothetical to the VE; 2) the ALJ erred in not taking into consideration that plaintiff had to elevate both legs during the course of the day, not just his right leg; 3) the ALJ failed to note that Dr. Arms recommended that plaintiff ice his knee in conjunction with elevating his legs.

First, there is no medical evidence in the record that supports plaintiff's argument that, just because his recliner at home elevates his feet to a height 15 in. above the floor, he has a medical need to elevate his feet that high.  Indeed, the only place in the record where the 15 in. figure is

found is in plaintiff's memorandum in support of his request for review by the Appeals Council (Doc. 5, p. 242), and in his affidavit attached to the memorandum in these proceedings where he writes: "The foot rest on my recliner measure[s] 15 inches from the floor" (Doc. 9, Ex. A, ¶ 6, p. 2 of 5). Plaintiff's argument that his recliner elevates his feet to 15 in. above the floor does not constitute medical evidence, objective or otherwise, that he has a medical requirement to raise his feet to that specific height above the floor, and his argument to that end borders on frivolous.[29]

There also is no objective medical evidence in the record that establishes plaintiff's alleged left knee pain.[30] Plaintiff's alleged left knee pain is based solely on his subjective complaints. Moreover, there is no medical evidence in the record, objective or otherwise, that plaintiff has to elevate both his left leg and his right leg. Nor has any doctor whose records are before the court determined that to be a medical requirement in plaintiff's case.

The evidence to which plaintiff refers in the quotation above at p. 17 stems, as noted above on p. 7, from Dr. Arms' March 29, 2011 and February 12, 2012 records. Dr. Arms recommended on March 29, 2011 that in inquiry should be made to see "if he would be allowed to have a trial of desk duty with his leg elevated . . . ." (Doc. 5, p. 330) On February 12, 2012, Dr. Arms wrote that he was "hopeful that desk duties with intermittent extremity elevation and icing to the knee might be an option." (Doc. 5, p. 467) These two clinical notes are unambiguous. Plaintiff presented to Dr. Arms for right knee pain on those two dates – not left knee pain. (Doc. 5, pp. 329, 466)

---

[29] The Magistrate Judge notes for the record that elevating one's leg to reduce swelling is not a function of height above the floor, but the position of the elevated leg(s) relative to the upper body.

[30] The first mention of plaintiff's alleged left knee pain is in the transcribed November 30, 2011 and June 11, 2012 records of Dr. Wall. (Doc. 5, pp. 221, 223) In the November 30th record, the alleged left knee pain is characterized as a "new . . . osteoarthritis pain." (Doc. 5, p. 221) Apart from these scant records based on plaintiff's subjective complaints, the only other evidence in the record of plaintiff's alleged left knee pain is where plaintiff testified at the hearing that his left knee pain had gotten worse since an arthroscopic procedure on his knee several years prior, and that he had to elevate his left leg it to relieve the pain. (Doc. 5, p. 34)

Moreover, no mention is made of plaintiff's left knee in either of these records. (Doc. 5, pp. 329-30, 466-67) Finally, Dr. Arms' use of the singular form of words "leg" on March 29th and "knee" on February 12th supports the conclusion that his recommendation pertained solely to plaintiff's right leg/knee . . . not to both legs/knees.

In addition to the foregoing, as noted above at p. 3, the medical source statement completed by Dr. Wall on August 31, 2012 just a week before the hearing reads: "[s]everal times a day this patient elevates his right leg for knee pain relief and to prevent swelling." The medical source statement makes no mention of plaintiff's left leg/knee or any need to elevate both legs. Moreover, in his affidavit executed on January 8, 2013, more than four months after the hearing, Dr. Wall states: "I have reviewed the medical assessment I prepared on August 31, 2012 . . . [and] . . . [t]he limitations described in the assessment existed then and continue to exist . . . ." (Doc. 5, ¶ 4, p. 495) In short, Dr. Wall's affidavit reaffirms his earlier assessment that, "[s]everal times a day this patient elevates his right leg for knee pain relief and to prevent swelling" – the affidavit mentions nothing about plaintiff's alleged need to elevate his left leg.

Finally, plaintiff argues that the ALJ erred in not mentioning that Dr. Arms noted "icing to the knee might be an option." Plaintiff does not specify to which knee he is referring. To the extent that his argument pertains to icing the left knee, that argument is without merit for reasons already explained. To the extent that it pertains to plaintiff's right knee, a single notation made over a course of thirty-three-plus treatments that icing the right knee intermittently "might be an option" scarcely constitutes objective medical evidence that icing the knee constitutes a medical necessity. In any event, as the ALJ included the need to elevate the right leg in his RFC assessment, any error in failing to mention icing the knee – already elevated by the terms of the hypothetical – would constitute harmless error at most. More particularly, icing one's knee intermittently on a leg already

elevated would have zero effect on plaintiff's RFC.

Plaintiff's first claim of error is without merit for the reasons explained above.

### 2. Whether the ALJ Failed to Consider the Combined Effects of Plaintiff's Multiple Impairments, Including Pain (Doc. 9, pp. 4-24)

Plaintiff argues that the ALJ committed reversible error in not considering the combined effects of his multiple impairments. (Doc. 9, p. 4)

An ALJ is required to consider the combined effects of a claimant's impairments in making his disability determination. However, "[a]n ALJ's individual discussion of multiple impairments does not imply that he failed [he] failed to consider the effect of the impairments in combination, where the ALJ specifically refers to a 'combination of impairments' in finding that the plaintiff does not meet' a listed impairment." *Hill v. Comm'r of Soc. Sec.*, 560 Fed.Appx. 547, 551 (6th Cir. 2014)(quoting *Loy v. Sec'y of Health and Human Servs.*, 901 F.2d 1306, 1310 (6th Cir. 1990)).

The ALJ discussed each of plaintiff's several impairments separately, in detail, and the medical evidence associated therewith. (Doc. 5, pp. 16-18) The ALJ also made the following relevant statements in his decision regarding the combined effects of plaintiff's impairments: 1) "the combined effects of all impairments must be considered in determining the matter of severity even if each impairment alone is not severe" (Doc. 5, p. 16); 2) "The undersigned has considered the severity of the claimant's alleged physical impairments. When considered singly or in combination, they do not meet or medically equal the criteria specified . . . ." (Doc. 5, ¶ 4, p. 18) This was all the ALJ was required to do in considering the combined effects of plaintiff's impairments.

Plaintiff's second claim of error is without merit for the reasons explained above.

### 3. Whether the ALJ Erred in Rejecting the Opinions of Plaintiff's Treating Physicians (Doc. 9, pp. 24-29)

Plaintiff argues that: 1) Dr. Wall had been plaintiff's treating physician for more than 20 years and had a detailed longitudinal picture of his impairments; 2) all of the criteria listed in the regulations to warrant giving his medical opinion controlling weight; 3) his treating source medical opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques; 4) his treating source medical opinion is not inconsistent with the other substantial evidence in the record.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). However, the ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip*, 25 F.3d at 287. If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)).

The Commissioner is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule."

*Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544)).

The ALJ's reasoning for not giving Dr. Wall's medical opinion controlling weight is quoted below in its entirety:

> As for the opinion evidence, Dr. Wall submitted an assessment opining the claimant was unable to lift more than 10 pounds occasionally; could stand and/or walk for up to 30 minutes at one time, but for less than 2 hours in an 8-hour workday; could only sit for about 45 minutes without interruption, but for no more than 4 hours in and 8-hour workday; could rarely climb ramps and/or stairs, balance, crouch, kneel, crawl, or stoop; could never climb ladders, ropes, or scaffolds; was unable to reach, push, or pull; and could not be exposed to heights, moving machinery, cold temperatures, humidity, or vibrations. Dr. Wall further opined the claimant must elevate his right leg for knee pain relief, to prevent swelling in the right knee, and to alleviate back pain. As a treating physician, Dr. Wal''s opinion is entitled to consideration for controlling weight. SSR 96-2p also provides that a medical opinion provided by a treating physician must be well supported by medically acceptable clinical and laboratory diagnostic techniques and cannot be inconsistent with other substantial evidence of record. In this case, the undersigned finds Dr. Wall's opinion is not consistent with the record. Dr. Wall's transcribed records show he supplied random opinions regarding the claimant's ability to perform work activity, his opinions were, if anything, generalizations noting the claimant was "unable to work", unable to sit or stand, and able to lift 20 pounds (Exhibit 14E). The ultimate conclusion as to disability is an administrative determination reserved by the Commissioner (SSR 96-5p ). Furthermore, the transcribed records show the claimant was generally in no apparent distress; well appearing; had an intact gait; and had no clubbing, edema, or deformities. Although the undersigned has not accorded controlling weight to Dr. Wall's opinion, the undersigned has accorded Dr. Wall's opinion with significant weight in that the claimant can lift up to 20 pounds and must elevate his right leg and foot to alleviate his pain. Furthermore, the claimant testified that he spent the majority of his day sitting in his recliner.

(Doc 5, pp. 20-21)(emphasis added)

As shown above, the ALJ recognized that Dr. Wall was a treating physician under the regulations and that, absent good reason, his assessment was entitled to controlling wight. As shown

above, the ALJ gave good reasons for not giving Dr. Wall's opinions controlling weight. Moreover, the ALJ's decision is supported by the medical evidence, including the medical records of other medical professionals discussed above at pp. 3-10, *i.e.*, Drs. Arms and Hazlewood, both of whom were treating physicians in their own right, as well as Drs. Keown, Settle, and Robinson. As for Drs. Arms and Hazlewood, their records establish that, although plaintiff has physical limitations, none are so severe that he is unable to perform sedentary work. It also is relevant to recall here Dr. Hazlewood's March 18, 2010 notation that, as of that date, "plaintiff's 'primary care physician [Dr. Wall] . . . ha[d]n't done anything'" for him, an observation borne out by Dr. Wall's records which show absolutely no objective medical evidence in support of his treatment and/or medical assessment. Finally, the ALJ's statement quoted above makes it clear to subsequent reviewers why Dr. Wall's opinion was not given controlling weight.

Plaintiff's third claim of error is without merit for the reasons explained above.

### 4. Whether the ALJ Erred in Stating That Plaintiff Had Declined Operative Procedures Recommended by His Physicians, Declined Functional Capacity Evaluations to Determine His Ability to Perform Work-related Activities, and Performed His Usual Work-related Activities Following His Injuries (Doc. 9, pp. 30-38)

Plaintiff's argument is three-fold: 1) the ALJ erred in stating that plaintiff had declined operative procedures recommended by his physicians; 2) the ALJ erred in stating that plaintiff declined submit to a FCE to determine his ability to work; 3) the ALJ erred in stating that plaintiff performed his usual work-related activities following his activities. Plaintiff provides no factual allegations, argument, reference to the record, or citation to case law in support of 2) and 3) above. Therefore, these claims are conclusory. The district court is not obligated on judicial review to supply factual allegations in support of claims where no facts are alleged. *See Hollon ex rel. Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006)("[W]e decline to formulate arguments on

[appellant's] behalf").  Because these parts of plaintiff's fourth claim of error are conclusory, they are without merit, and will not be considered further.

The only remaining part of plaintiff's fourth claim of error is that the ALJ erred in stating that plaintiff declined operative procedures recommended by his physicians.  This part of plaintiff's fourth claim of error is based on 20 C.F.R. § 404.1530, which provides in pertinent part: "In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."  (Doc. 9, p. 30)  Citing *Fraley v. Sec'y of Health and Human Serv's*, 733 F.2d 437, 440 (6th Cir. 1984), plaintiff argues that the medical treatments plaintiff declined to take were recommended/suggested rather than prescribed and, as such, the ALJ erred in denying benefits because plaintiff did not follow those recommendations/suggestions.  (Doc. 9, p. 30)

Although there is a paucity of current case law on this issue, the long-standing law in the Sixth Circuit is that an impairment that can be remedied by treatment will not serve as a basis for a finding of disability.  *Young v. Califano*, 633 F.2d 469, 472-73 (6th Cir.), *cert. denied, 389 U.S. 993 (1967); Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir.), *cert. denied*, 389 U.S. 993 (1967).  More particularly, "[a] claimant must follow prescribed treatment in order to obtain benefits absent good reason."  *Johnson v. Comm'r of Soc. Sec.*, 535 Fed.Appx. 498, 507 (6th Cir. 2013)(citing 20 C.F.R. § 404.1530).

In applying social security regulations, the Sixth Circuit has distinguished treatments "prescribed" by a treating physician from those that are merely "recommended" or "suggested." *Fraley*, 733 F.2d at 440; *Young*, 633 F.2d at 473.  In short, § 404.1530 pertains to prescribed courses of treatment, not suggested/recommended courses of treatment.

A plain reading of the record shows that the courses of treatment at issue were suggested/recommended, not prescribed as required under *Fraley* and *Young*.  Notwithstanding that the courses of treatment at issue were suggested/recommended, and not prescribed, "[f]ailure to

24

follow prescribed treatment becomes a determinative issue only if the claimant's impairment is found to be disabling under steps one through five and is amenable to treatment expected to restore ability to work." *Hester v. Sec'y of Health and Human Serv's*, 886 F.2d 1315 at * 3 (6th Cir. 1989)(citing 20 C.F.R. §§ 404.1530, 416.930; *Harris v. Heckler*, 756 F.2d 431, 436 n. 2 (6th Cir. 1985); *Fraley*, 733 F.2d at 440. Moreover, "a conservative course of treatment can undermine allegations of debilitating pain . . . ." *Johnson*, 535 Fed.Appx. at 507 (citation omitted). In other words, insisting on conservative medical treatment may reflect adversely on a claimant's credibility when it comes to his allegations of pain.

The ALJ addressed this issue in the RFC analysis portion of his decision. The statement at issue is quoted below in relevant part:

> In sum, after reviewing the clinical and objective findings in addition to the factors contained in SSR 96-7p, the undersigned finds the claimant's medically determinable impairments could produce his alleged systems; however, **the medical evidence did not support the degree to which he alleges their limiting effects**. The record establishes the claimant received work-related injuries to his lumbar spine and to his right knee. However, the record further shows the claimant has declined operative procedures recommended by his physicians . . . .

(Doc. 5, p. 21)(emphasis added) The ALJ's RFC analysis was performed between steps three and four, not following a determination of disability at step five as provided under *Hester*. Moreover, the ALJ considered the fact that plaintiff declined operative procedures recommended by his physicians in the context of plaintiff's credibility which was entirely proper under *Johnson*. Consequently, the final element of plaintiff's fourth claim of error is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 8) be **DENIED** and the Commissioner's decision

**AFFIRMED**.

The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 25th day of November, 2014.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge